**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 19, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
———————————————————

CODY WILLIAM COX,

      Plaintiff - Appellant/Cross-
      Appellee,

v.

DON WILSON, in his individual capacity,

      Defendant - Appellee/Cross-
      Appellant.

Nos. 18-1353 & 18-1376
(D.C. No. 1:15-CV-00128-WJM-NYW)
(D. Colo.)

———————————————————

**ORDER**
———————————————————

Before **TYMKOVICH**, Chief Judge, **BRISCOE**, **LUCERO**, **HARTZ**, **HOLMES**, **MATHESON, BACHARACH**, **PHILLIPS**, **MCHUGH**, **MORITZ**, **EID**, and **CARSON**, Circuit Judges.

———————————————————

On May 22, 2020, the court issued its opinion and judgment in these matters. An active judge of the court then called a poll, *sua sponte*, to consider en banc review of the panel decision. Subsequently, the panel *sua sponte* granted panel rehearing to amend its May 22, 2020 opinion for clarification purposes, and circulated its amended opinion to the en banc court.

A majority of the judges in regular active service voted against en banc rehearing, and as a result the poll failed. *See* Fed. R. App. P. 35(a). Judges Lucero and Phillips voted

to grant en banc rehearing. Judge Lucero has prepared the attached written dissent from the denial of en banc rehearing, in which Judge Phillips joins.

Pursuant to the panel's *sua sponte* grant of panel rehearing, the original version of the opinion is withdrawn and shall be replaced by the attached amended opinion. Because the amended opinion contains only non-substantive changes that do not affect the outcome of this appeal, it shall be filed *nunc pro tunc* to the date the original opinion was filed.

The mandate shall issue forthwith.

Entered for the Court

CHRISTOPHER M. WOLPERT, Clerk

2

18-1353 & 18-1376, <u>Cox v. Wilson</u>

**LUCERO**, J., joined by **PHILLIPS**, J., dissenting from the denial of rehearing en banc:

Because the panel decision in this case exponentially expands in this circuit the judicially created doctrine of qualified immunity into an all-purpose, no-default, use-at-any-time defense against asserted police misconduct, and because it clearly demonstrates so much of what is wrong with qualified immunity, I requested that my colleagues review the panel decision en banc. From the denial of that request, I respectfully dissent.

Before the panel was an appeal asserting instructional error at trial below, and on cross-appeal, several unrelated evidentiary issues. Instead of expressly ruling on the merits of the issues raised and granting the parties the due process to which they are entitled, the panel chose to openly entangle the previously denied and dismissed doctrine of qualified immunity into its analysis. It denied the parties a ruling on the merits of their appeal and instead concluded that because police misconduct in a prior case was arguably more egregious than the misconduct at issue in this case—but was nevertheless shielded by qualified immunity—the deputy sheriff in this case is similarly protected by qualified immunity. Specifically, the panel reasons that because the conduct in the prior case was apparently "improp[er]" to "most laypersons" but not in violation of clearly established law, it follows that the officer's conduct in this case is also not a violation of clearly established law. (Op. 18.)

I review the facts: the appellee, Deputy Wilson, pursued a motorist who recklessly drove his vehicle on an icy Interstate 70. Fortunately, the motorist, Cox, drove into a traffic jam that forced him to slow down and allowed Wilson and a second patrol

car to box him in. With Cox stopped, Wilson exited his car, approached Cox's vehicle at the passenger window, and—in the panel's words—"[a]lmost immediately" shot Cox in the neck. Cox was unarmed. He is now a quadriplegic.

Suit followed. Deputy Wilson raised qualified immunity in his Answer and, following discovery, moved for summary judgment on the basis of qualified immunity. On the finding that there was a conflict in the evidence on point, the district court denied qualified immunity. Interlocutory appeal was not taken. The case proceeded to trial and ended in a mistrial. Only then did Wilson seek to bring an interlocutory appeal based on the earlier denial of qualified immunity. Because it was untimely, a panel of this court dismissed the appeal. It added that in addition to being untimely, final judgment had not been entered. The case again proceeded to trial and, following the close of evidence in the second trial, Deputy Wilson sought to raise qualified immunity again—this time in a Rule 50(a) motion for judgment as a matter of law. That motion was denied. A jury verdict was entered favoring Wilson, and an appeal was taken by Cox, presenting a straightforward question: did the district court err in failing to instruct the jury on his theory of the case? Deputy Wilson cross-appealed on three unrelated damages and evidence issues. He did not appeal the issue of qualified immunity but argued in a responsive brief that alternatively, the judgment below could be affirmed on any basis supported by the record, including qualified immunity.[1]

---

[1] Following the second trial, Wilson attempted to appeal the district court's denial of his Rule 50(a) motion in which he raised qualified immunity, but he did not move for a directed verdict on his qualified immunity defense under Rule 50(b). A pre-verdict Rule

2

In addressing the issue presented to it by the appellant—whether error was committed in failing to instruct on plaintiff's theory of the case—the panel acknowledges our decision in Higgins v. Martin Marietta Corp., 752 F.2d 492 (10th Cir. 1985), in which we held that "a party is entitled to an instruction of [its] theory of the case only if the theory is supported by competent evidence." Id. at 496. This test is satisfied if the requesting party provides "more than a mere scintilla of evidence to support an instruction." Farrell v. Klein Tools, Inc., 866 F.2d 1294, 1297 (10th Cir. 1989). The panel acknowledges that the district court misinterpreted Supreme Court precedent and our own in denying Cox's requested instruction, and it discusses the testimony Cox adduced in support of the instruction from—as the panel put it—an expert with "excellent credentials." (Op. 10-14.) But rather than reach the conclusion compelled by these acknowledgements, the panel resurrects the qualified immunity issue, and from it, fashions something akin to harmless-error review: it concludes the court committed no error at all because "including the sentence omitted by the court would have denied Wilson the qualified immunity to which he was entitled." (Op. 12.)

As has been noted, the text of 42 U.S.C. § 1983 "makes no mention of defenses or immunities." Baxter v. Bracey, 140 S. Ct. 1862, 1862 (2020) (Thomas, J., dissenting from the denial of certiorari) (quotation and alteration omitted). Qualified immunity is

---

50(a) motion "cannot form the basis of [an] appeal." Unitherm Food Sys. v. Swift-Eckrich, Inc., 546 U.S. 394, 406 (2006). The panel nevertheless granted qualified immunity notwithstanding this procedural default. This is but one more example of the panel choosing to ignore procedural default and hastening to use the "new and improved" mutated doctrine of qualified immunity.

entirely a court-created doctrine.  As concerns police officer misconduct, it stems from the Court's 1967 decision, Pierson v. Ray, 386 U.S. 547, 556-57 (1967).  Following its creation, which intended to prevent frivolous and harassing litigation, see Pearson v. Callahan, 555 U.S. 223, 231 (2009), the doctrine has mutated in seemingly unending fashion.  The case before us is Exhibit A of that continuing transformation.  Much of the problem with the expansion of the doctrine is exacerbated because the Court has failed to give direction on (1) the scope of appellate court power to raise qualified immunity as a basis for disposition of a case when qualified immunity was denied by or not raised before the district court, and (2) the required nexus of particular facts necessary to satisfy the clearly-established element of qualified immunity analysis.

In concluding that Wilson was entitled to qualified immunity, the panel relies solely on the second prong of the qualified immunity inquiry—whether the constitutional right violated "was clearly established at the time of the defendant's unlawful conduct." (Op. 13 (citing Pauly v. White, 874 F.3d 1197, 1214 (10th Cir. 2017), cert. denied, 138 S. Ct. 2650 (2018)).)  But it ignores that the district court denied qualified immunity to Wilson under this prong because the relevant "factual context [wa]s highly disputed." See City of Escondido, Cal. v. Emmons, 139 S. Ct. 500, 503 (2019) ("Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." (quotation omitted)).  And worse, rather than compare the specific facts of the present case with those of prior cases, the panel satisfies

4

itself with comparing the relative perceived egregiousness of police conduct in factually dissimilar cases.

Specifically, the panel relies only on the facts of Pauly, a case that did not involve a car chase, vehicular pursuit, or any facts remotely similar to the facts of the instant case. 874 F.3d at 1203-05. Rather, Pauly involved a situation in which several officers, on foot, approached the plaintiff's rural home "using their flashlights only intermittently until they neared the front door." (Op. 16.) Fearful that there were intruders, the plaintiff and his brother "asked who was approaching," to which "the officers responded hostilely, yelling[,] 'Hey, (expletive), we got you surrounded. Come out or we're coming in.'" (Op. 16-17 (quotation omitted).) In response, the brothers armed themselves, announced that they had guns, and one of the officers shot and killed one of the brothers after seeing him point a gun in the officer's direction. (Op. 17.)

These facts bear virtually no resemblance to those of the present case. Nevertheless, the panel relies on Pauly to conclude that Deputy Wilson is protected by qualified immunity, stating:

> Pauly illustrates the strength of the protection provided by qualified immunity. Unlike Wilson's decision to leave his vehicle to try to disable Cox's vehicle, the impropriety of the alleged actions by the officers before the shooting in Pauly would be apparent to most laypersons. Yet the Pauly officers were protected by qualified immunity because of the absence of clearly established law prohibiting their conduct. If qualified immunity protects the officers in Pauly against the claim of unreasonably creating a dangerous situation that led to the use of deadly force, surely Wilson is similarly protected.

5

(Op. 18.)[2]  Thus, rather than attempt to compare the particular facts of Pauly with the particular facts of the present case, the panel compares its assessment of the relative impropriety of wholly different misconduct in distinct qualified immunity cases to determine whether the clearly-established prong is satisfied.[3]

No precedent supports this novel, expansive inquiry.  The Supreme Court has repeatedly warned lower courts not to assess the clearly-established prong at a high level of generality.  See City of Escondido, 139 S. Ct. at 503 ("[T]he clearly established right must be defined with specificity.  This Court has repeatedly told courts not to define clearly established law at a high level of generality." (quotation and alteration omitted)).  "Clearly established" means "the 'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  DeSpain v. Uphoff, 264 F.3d 965, 979 (10th Cir. 2001) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  This inquiry must be "particularized" to the facts of the case, White v. Pauly, 137 S. Ct. 548, 552 (2017) (quotation omitted), and it "must be undertaken in light of the specific context of the case, not as a broad general proposition," Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quotation omitted).

---

[2] The quoted language appears in the panel opinion as filed on May 22, 2020.

[3] On August 19, 2020, panel rehearing was granted, and the final sentence in the foregoing quote was deleted.  The following words were substituted, nunc pro tunc:  "So too, here."  This substituted analytical standard, in my judgment, is even more deficient than the standard announced in the deleted sentence.  Apparently, trial courts and appellate panels of this circuit need only cite to a previous decision in which qualified immunity has been granted and state, "So too, here."  Those words present no reviewable standard whatsoever.

The panel opinion moves far afield of these strictures. At a time when "courts of appeals are divided—intractably—over precisely what degree of factual similarity must exist" for a constitutional violation to be clearly established, Zadeh v. Robinson, 928 F.3d 457, 479 (5th Cir. 2019) (Willett, J., concurring in part, dissenting in part), the panel opinion effectively signals to lower courts that they may circumvent issues of factual fit by relying on idiosyncratic assessments of the relative impropriety of officer misconduct. Shifting the focus from "particularized" facts to nebulous notions of comparative impropriety places this case squarely into the conflict among our sibling circuits in applying the clearly-established prong. See id.; see also John C. Jeffries, Jr., What's Wrong with Qualified Immunity?, 62 Fla. L. Rev. 851, 852 (2010) ("[D]etermining whether an officer violated 'clearly established' law has proved to be a mare's nest of complexity and confusion. The circuits vary widely in approach, which is not surprising given the conflicting signals from the Supreme Court.").[4] And it calls for just "the sort of 'freewheeling policy choice[s]'" the Court has "disclaimed the power to make." Ziglar v. Abbasi, 137 S. Ct. 1843, 1871 (2017) (Thomas, J., concurring in part and concurring in the judgment) (quoting Rehberg v. Paulk, 566 U.S. 356, 363 (2012)).

Further, the panel's most unusual resurrection of the qualified immunity issue to correct a squarely presented trial error similarly invites lower courts to make

---

[4] Illustrating the problem with the reasoning of the panel, it is easy to identify cases in which officers committed arguably less egregious conduct than Wilson and were not protected by qualified immunity. See, e.g., Est. of Ceballos v. Husk, 919 F.3d 1204, 1215-17 (10th Cir. 2019). The panel opinion creates and applies a highly generalized inquiry likely to produce contradictory results in the future.

"freewheeling policy choice[s]" inappropriate under § 1983. Rehberg, 566 U.S. at 363. It is a fundamental principle that "[c]ourts do not, or should not, sally forth each day looking for wrongs to right." Greenlaw v. United States, 554 U.S. 237, 244 (2008) (quotation omitted). Instead, we generally "decide only questions presented by the parties." Id. (quotation omitted). Though the federal courts of appeals disagree as to whether courts are empowered to raise sua sponte the affirmative defense of qualified immunity on behalf of the government,[5] none have suggested appellate power extends to reversing the trial court's denial of qualified immunity when such reversal has not been appealed—until now. Thus, by resurrecting an issue raised, resolved, and not appealed, the panel takes yet another step down the road of mutating the doctrine into an "absolute shield" against consequences for the violation of constitutional rights. See Kisela v. Hughes, 138 S. Ct. 1148, 1155 (2018) (Sotomayor, J., dissenting). As noted, this case is Exhibit A of that metastasis.

For these reasons, the panel's decision is neither "right [n]or just under the law." Id. The modern qualified immunity doctrine already sends the "alarming signal to law enforcement officers . . . that they can shoot first and think later." Id. Our panel opinion

---

[5] Compare Guzmán-Rivera v. Rivera-Cruz, 98 F.3d 664, 667-68 (1st Cir. 1996); Bines v. Kulaylat, 215 F.3d 381, 386 (3d Cir. 2000); Suarez Corp. Indus. v. McGraw, 125 F.3d 222, 226 (4th Cir. 1997); Kelly v. Foti, 77 F.3d 819, 823 (5th Cir. 1996); Summe v. Kenton Cnty. Clerk's Off., 604 F.3d 257, 269-70 (6th Cir. 2010); Narducci v. Moore, 572 F.3d 313, 323-25 (7th Cir. 2009); Greer v. Dowling, 947 F.3d 1297, 1303 (10th Cir. 2020); Moore v. Morgan, 922 F.2d 1553, 1557-58 (11th Cir. 1991); and Robinson v. Pezzat, 818 F.3d 1, 11 (D.C. Cir. 2016), with Dean v. Blumenthal, 577 F.3d 60, 67 n.6 (2d Cir. 2009); Story v. Foote, 782 F.3d 968, 969-70 (8th Cir. 2015); and Graves v. City of Coeur D'Alene, 339 F.3d 828, 845 n.23 (9th Cir. 2003).

adds another signal: egregious police misconduct will go unpunished if the court can locate prior, arguably more improper conduct that escaped liability. In other words, the Tenth Circuit now holds that a reasonable officer would <u>not</u> "understand that what he is doing violates [a constitutional] right," <u>Anderson</u>, 483 U.S. at 640, if "worse" conduct has previously been shielded by qualified immunity. This terrible precedent, thus created, is two-fold. One: it allows panels to use qualified immunity, at any stage of litigation, to uphold an otherwise erroneous decision of the district court—notwithstanding a substantial dispute regarding the evidence; notwithstanding the denial of a previous motion not appealed in a timely manner; and notwithstanding the district court denied qualified immunity time and again. Two: it shields police misconduct from liability so long as any other government officer at some point committed—in the panel's mind—more improper conduct and was not held liable. Together, these two pronouncements create a carte blanche which can be scripted and negotiated to counter the public interest and foster the violation of constitutional rights by those charged with protecting them.

Regrettably, this case is one of many illustrating that the profound issues with qualified immunity are recurring and worsening. "Given the importance" of these issues, we can no longer delay confronting them. <u>Baxter</u>, 140 S. Ct. at 1865 (Thomas, J., dissenting from the denial of certiorari). Particularly in light of recent—though not novel—unrest, at least one of our sibling circuits has recognized that the relentless transformation of qualified immunity into an absolute shield must stop. <u>See</u> <u>Est. of Jones by Jones v. City of Martinsburg</u>, 961 F.3d 661, 673 (4th Cir. 2020), <u>as amended</u> (June 10,

9

2020). But as it stands in the Tenth Circuit, the panel opinion allows courts to finesse ambiguities to avoid confronting the hard issues presented. And that's a denial of due process any way you look at it. By continuing to await addressing deep and troubling qualified immunity issues brought to our attention time and again, we are complicit in this denial.

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CODY WILLIAM COX,

      Plaintiff - Appellant/Cross-
      Appellee,

v.

DON WILSON, in his individual capacity,

      Defendant - Appellee/Cross-
      Appellant.

Nos. 18-1353 & 18-1376

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:15-CV-00128-WJM-NYW)**
_____

James F. Scherer, Miller & Law, P.C., Littleton, Colorado, argued on behalf of
Appellant/Cross-Appellee

Gordon L. Vaughan (Ann B. Smith, with him on the briefs), Vaughan & Demuro,
Colorado Springs, Colorado, argued on behalf of Appellee/Cross-Appellant.
_____

Before **HARTZ** and **EID**, Circuit Judges[*]

_____

[*] The late Honorable Monroe G. McKay, United States Senior Circuit Judge, heard oral
argument and participated in the panel's conference of this appeal, but passed away
before its final resolution. The practice of this court permits the remaining two panel
judges, if in agreement, to act as a quorum in resolving the appeal. *See United States v.
Wiles*, 106 F.3d 1516, 1516, n* (10th Cir. 1997); 28 U.S.C. § 46(d).

_____

**HARTZ**, Circuit Judge.

_____

Plaintiff Cody Cox sued Defendant Don Wilson, a deputy in the Clear Creek County Sheriff's Department, under 42 U.S.C. § 1983. Cox alleged that when Wilson shot him in his vehicle while stopped on Interstate 70, Wilson violated the constitutional prohibition against the use of excessive force by law-enforcement officers. Plaintiff appeals the judgment on the jury verdict against him. He argues that the district court erred in failing to instruct the jury to consider whether Wilson unreasonably created the need for the use of force by his own reckless conduct. We have jurisdiction under 28 U.S.C. § 1291 and affirm. Although the district court incorrectly stated that the Supreme Court had recently abrogated this court's precedents requiring such an instruction in appropriate circumstances, the evidence in this case did not support the instruction. No law, certainly no law clearly established at the time of the incident, suggests that Wilson acted unreasonably up to and including the time that he exited his vehicle and approached Cox's vehicle.

## I. Background

### A. The Shooting

Cox was shot on January 31, 2014, after a car chase on Interstate 70. It had been snowing so the Interstate was wet, and some parts were snow-packed or icy. The first officer to pursue Cox was Clear Creek County Deputy Sheriff Kevin Klaus. Although Klaus testified about his observations during the pursuit, the only evidence relevant to the

propriety of Wilson's actions is what Wilson observed or what he was informed of by others. Therefore, our account of what happened before Wilson joined the pursuit is limited to what was broadcast on police radio channels that Wilson heard.

The radio traffic indicated a dangerous situation. It began as Cox's Toyota pickup passed Exit 235 on the interstate. The dispatcher said, "[W]e've got about three 9-11 calls." Aplt. App., Vol. VII at 1566. An officer reported that Cox had "I-70 pretty-well blocked up behind him and he's having a hard time getting up the road." *Id.* at 1567. The officer described the vehicle as a "Silver Tacoma with damage all over the body and a camper shell on the back." *Id.* Klaus reported that at about mileage marker 232½, Cox "just wiped out in the, uh, number one lane. He's – was all over the road." *Id*. at 1568. Klaus also noted that his police vehicle did not have a siren. *Id.* Klaus then reported that near Exit 232 the pickup "got stuck, but he's trying to get away again. I'm not going to contact until I get some cover." *Id.* at 1569. He said: "I verbally told the party to turn off his car. I do have a good look of – at him, and he's taking off again. Westbound. All over the road." *Id.* An officer reported that traffic was "almost at a standstill" about 4 miles ahead. *Id.* Klaus said he needed help from someone with a siren and reported that there was "nobody in front of this guy, but we have a lot behind me." *Id.* After the other officer reported that he was at Exit 228, Klaus responded, "Uh, the way he's driving, I doubt we'll make it that far." *Id.* Another officer stated that he had "spike strips" (also referred to by officers as stop sticks) and would join the two police vehicles already at Exit 228. *Id.* at 1570. Klaus then reported that Cox was driving 60 miles per hour, then 70, and then 80 at mileage marker 230½.

After an officer reported that westbound traffic was stopped about a mile and a half

3

ahead, Klaus said, "[W]e just caught up with this traffic.  He is not going to stop."  *Id.*  Klaus continued, "[W]e're going to have to, uh, take some physical action on this vehicle.  This guy has got to be very drunk, and he is not stopping."  *Id.* at 1571.  Shortly after that, Klaus reported, "We're in bumper-to-bumper traffic now at the 229½.  He is not stopping.  He's just showing me a peace sign."  *Id.*  Another officer informed the others that he was at the 228 offramp with spike strips.

About that time, Wilson, whose vehicle had a siren, had caught up with Cox and taken over from Klaus as leader of the pursuit.  For the next mile, traffic became heavily congested, moving slowly in a stop-and-go fashion.  The pursuit proceeded at speeds between 5 and 15 miles per hour.  Wilson observed Cox continue to drive dangerously.  Each time Cox was momentarily stopped by the traffic, he would wait for an opening and then accelerate through any gaps in the cars, losing traction and fishtailing wildly nearly a dozen times and coming very close to striking nearby vehicles.  He refused to pull over in response to Wilson's lights and sirens or Wilson's repeated orders over his loudspeaker that Cox stop his vehicle.  Wilson believed that Cox was not going to stop.

Wilson was able to pull along the right side of Cox's vehicle, which was in the left-hand lane about five feet from the guardrail, while traffic continued to move very slowly in a stop-and-go fashion.  Wilson had his window down and motioned for Cox to roll down his window, which Cox did.  But Cox continued to ignore Wilson's repeated orders to turn off his engine.  On several occasions Wilson observed Cox drop his right hand down to his right hip; given the circumstances, Wilson assumed that Cox was reaching for a firearm.  Cox kept driving forward when possible, rolling up a few feet each time the traffic moved

4

forward. Wilson believed that Cox was striking the rear bumper of the car in front of him, driven by Sarah Kincaid, and pushing her car forward each time that he pulled ahead. But Wilson testified that he was mistaken on this point; he said that his perceptions at that moment were impaired because he was concentrating on giving Cox instructions and determining whether Cox had a weapon.

Finally, Kincaid fully stopped her car, requiring Cox to stop. Kincaid stopped because she thought that Wilson wanted her to do so. But Wilson and Kincaid had not communicated at any point and Kincaid kept the engine running; so Wilson had no way of knowing that Kincaid was intentionally blocking Cox and would continue to do so even as traffic moved forward in front of her.

Klaus stopped his vehicle about 10 feet behind Cox. By this point Wilson had drawn his firearm and pointed it at Cox, again ordering Cox to turn off his engine. While Cox was boxed in, Wilson believed he had a brief window of time to get inside Cox's car and take the keys out of the ignition. He decided that prompt action was necessary because he believed that the next stretch of highway posed increasing dangers for the chase (for example, there was a crossover area a mile ahead where Cox could have driven into oncoming traffic), and that Cox could, in the slow-moving traffic, avoid the stop sticks that police had laid out at the next exit. Based on the radio transmissions, Wilson thought that officers providing support for the chase about a half mile to a mile down the road were not coming to assist him.

Wilson said that when he exited his vehicle, it was a car length ahead of Cox in the lane to the right. With his firearm drawn he moved toward Cox, again telling Cox to turn

5

off his engine. Almost immediately, he shot Cox through the open passenger window, striking Cox in the neck. The shooting incident, from the time Cox's vehicle came to a complete stop to the time that Wilson shot Cox, probably took about a minute.[1] The shot to the neck rendered Cox quadriplegic.

There was no dispute at trial regarding Wilson's knowledge of the police radio traffic before he took over the lead of the pursuit; nor was there any dispute regarding the stop-and-go nature of the traffic once he took the lead, Cox's dangerous driving, or Cox's refusal to comply with Wilson's repeated orders for Cox to turn off his engine. But the eyewitness trial testimony about the moments immediately preceding the shooting was not entirely consistent. Wilson claimed that before he stepped from his vehicle onto the highway, he witnessed Cox roll his car forward and backward twice. When he stepped onto the highway, Cox had backed up to a point completely behind his patrol car. He said that he shot Cox because Cox attempted to drive forward and to the right, toward his patrol car, in a manner that caused him to believe that he was going to be crushed and perhaps killed between the two vehicles. Klaus, however, testified that Wilson stopped his patrol car right next to Cox's car, and that Cox moved his car only once (a foot backward and then a foot forward) after coming to a complete stop behind Kincaid. Kincaid testified that

---

[1] The duration of the incident, from the time that Cox's car came to a complete stop to the time of the shooting, is somewhat uncertain. Klaus testified that he watched Cox's stopped car for less than a minute before exiting his car, and that Wilson shot Cox about four seconds later. Wilson testified based on the radio transmissions that the incident took about one minute and 15 seconds. Kincaid testified that the incident took "seven and a half minutes," Aplt. App., Vol. I at 181, but admitted that her perception was affected by the stress of the moment.

6

Wilson had not fully exited his vehicle when he shot Cox, and Cox had not moved his vehicle after stopping behind Kincaid with Wilson to his right.

Cox testified that he had no memory of the car chase or the shooting incident except that he recalled a silhouette of a person who came up to his window while he was stopped in traffic, he heard some words, and he hit the vehicle in front of him before losing consciousness.

### B.    Procedural History

Cox filed suit in the United States District Court for the District of Colorado asserting a single claim under 42 U.S.C. § 1983:  namely, that his shooting constituted the use of excessive force in violation of the Fourth Amendment's protection against unreasonable seizure.  Wilson asserted the defense of qualified immunity.

There have been two jury trials on Cox's claim.  The first jury returned a verdict in favor of Wilson, but the district court vacated the judgment because of misconduct at trial by defense counsel (who has since been replaced) and ordered a new trial.  After Cox rested his case in the second trial, Wilson moved under Fed. R. Civ. P. Rule 50(a) for a judgment as a matter of law on his qualified-immunity defense.  He renewed this motion at the close of evidence, but the court denied the motion.  The second jury also rendered a verdict in favor of Wilson.

Cox raises only one issue on appeal.  He contends that the district court improperly failed to instruct the jury that it could consider Wilson's reckless conduct before the shooting in determining whether the shooting violated the Fourth Amendment.  In his response to Cox's appeal and in support of his own cross-appeal, Wilson argues that the

7

district court committed several errors during the trial. But because we affirm the judgment in Wilson's favor, we need not address those matters.

## II. Discussion

In an excessive-force case, as in other Fourth Amendment seizure cases, a plaintiff must prove that the officer's actions were "objectively unreasonable," taking into account the "totality of the circumstances." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259–60 (10th Cir. 2008) (internal quotation marks omitted). Cox argues that the district court erred in failing to instruct the jury that in determining the reasonableness of Wilson's use of force, it could consider whether Wilson's own reckless conduct unreasonably created the need to use such force.

According to Cox, the district court's mistake was in changing the unreasonable-force jury instruction from what the court had used at the first trial. The court's instructions were almost identical to those it had previously given regarding what Cox needed to prove to establish his claim against Wilson. In both trials the court told the juries that the burden was on Cox "to establish by a preponderance of the evidence each of the following elements" of his excessive-force claim: "First: [Wilson] deprived [Cox] of his federal Constitutional right not to be subjected to unreasonable force while being stopped; Second: [Wilson] acted under the color of state law; and Third: [Wilson's] acts were the proximate cause of damages sustained by [Cox]." Aplt. App., Vol. VII at 1595. The court then instructed the juries on the "Factors To Consider When Determining Whether Plaintiff Has Proven The Elements Of His Claim." *Id.* at 1596. It told the juries that they could consider whether Cox had proved at least one of the following (each of

8

which would have sufficed to establish a violation of his Fourth Amendment rights):  (1) "that deadly force was not necessary to prevent [Cox] from escaping"; (2) "that [Wilson] did not have probable cause to believe that [Cox] posed a significant threat of serious physical injury to [Wilson] or others"; or (3) "that it would have been feasible for [Wilson] to give [Cox] a warning before using deadly force, but [Wilson] did not do so."  *Id.* at 1596–97.  And the court told the juries that they should "consider all the relevant facts and circumstances [Wilson] reasonably believed to be true at the time of the encounter," and that the inquiry "is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force at the time of the seizure." *Id.* at 1597.

But the court did make one change to the factors-to-consider instruction given at the first trial, and that is the basis of Cox's appeal.  The second-trial instruction excluded one sentence regarding the jury's reasonableness inquiry.  We set forth in regular type the pertinent paragraph from the instructions at the second trial, and italicize the sentence that was included at the first trial but not at the second:

> The reasonableness of Defendant's acts must be judged from the perspective of a reasonable officer on the scene at the time of the seizure, that is, the shooting.  One of the factors you should consider is whether Defendant Don Wilson was in danger at the time that he used force. *Defendant Don Wilson's own conduct prior to the shooting can be a part of your determination of reasonableness, but only if his own reckless or deliberate conduct during the seizure unreasonably created the need to use such force.* The concept of reasonableness makes allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are sometimes tense, uncertain, and rapidly evolving, about the amount of force that is necessary in a particular situation.

9

Aplt. App., Vol. I at 57 (italics), VII at 1597 (regular type). Cox objected to the instruction but was overruled. The court explained that it thought the deleted language was legally incorrect and that Cox's contention that Wilson's conduct before the shooting was reckless was unlikely to overcome qualified immunity. *See* Aplt. App., Vol. VII at 1436 ("It's my view that some subsequent decisions since the first trial call[] into question the continuing viability of that statement and that would be, in my view, the thinnest grounds that the plaintiff would have on the qualified immunity issue.").

We ordinarily review a lower court's refusal to give a particular instruction for abuse of discretion. *See Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1231 (10th Cir. 1999). "That deferential review is superseded, however, by this court's *de novo* review of the instructions given to determine whether, in the absence of the refused instruction, they misstated the applicable law." *Id.*; *see Burke v. Regalado*, 935 F.3d 960, 1009 (10th Cir. 2019) ("We review de novo whether, as a whole, the district court's jury instructions correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards." (internal quotation marks omitted)). Wilson argues that we should review the denial of the requested instruction for abuse of discretion, while Cox argues that our review is de novo. But we need not resolve that dispute because on de novo review we hold that the instruction would have been improper in light of the evidence.

There is some Supreme Court authority supporting the district court's view of the law. In *City & County of San Francisco, California v. Sheehan*, the Court stated that a plaintiff could not "establish a Fourth Amendment violation based merely on bad tactics

10

that result[ed] in a deadly confrontation that could have been avoided." 135 S. Ct. 1765, 1777 (2015) (internal quotation marks omitted). "[S]o long as a reasonable officer could have believed that his conduct was justified, a plaintiff cannot avoid summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless." *Id.* (original brackets and internal quotation marks omitted).

Two years later, *County of Los Angeles, California v. Mendez* rejected the Ninth Circuit's "provocation" rule, which had "permit[ted] an excessive force claim under the Fourth Amendment where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation." 137 S. Ct. 1539, 1546 (2017) (internal quotation marks omitted). "The rule's fundamental flaw," as the unanimous Court explained, was that it "use[d] another constitutional violation to manufacture an excessive force claim where one would not otherwise exist." *Id.* The rule went beyond the "operative question in excessive force cases,"—"whether the totality of the circumstances justifie[d] a particular sort of search or seizure," *id.* (internal quotation marks omitted)—and instead "instruct[ed] courts to look back in time to see if there was a different Fourth Amendment violation that [was] somehow tied to the eventual use of force," *id.* at 1547.

But *Mendez* made clear that it was not deciding the validity of the proposition of law stated in the sentence omitted from the instruction by the district court in this case. A footnote to the opinion states that the Court was declining to address the view that assessing the reasonableness of the use of force requires "taking into account

11

unreasonable police conduct prior to the use of force that foreseeably created the need to use it." *Id.* at 1547 n\*. And after both *Sheehan* and *Mendez* we held in *Pauly v. White* that "[t]he reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." 874 F.3d 1197, 1219 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 2650 (2018) (internal quotation marks omitted); *see also id.* at 1219 n.7 ("This has been the law in our circuit since 1995. . . . The Supreme Court very recently had an opportunity to resolve this issue [in *Mendez*] but declined to do so . . . .").

Nevertheless, the district court did not commit any error by declining to include the sentence in the instruction. A party is not entitled to a jury instruction just because it correctly states a proposition of law. It must be supported by the evidence at trial. *See Farrell v. Klein Tools, Inc.*, 866 F.2d 1294, 1297 (10th Cir. 1989) ("Under federal law it is error to give an instruction when there is no evidence to support it. There must be more than a mere scintilla of evidence to support an instruction. Sufficient competent evidence is required." (citations omitted)); *Higgins v. Martin Marietta Corp.*, 752 F.2d 492, 496 (10th Cir. 1985) ("[A] party is entitled to an instruction of [its] theory of the case only if the theory is supported by competent evidence. The evidence introduced at trial must warrant the giving of the instruction." (citations omitted)). In this case, including the sentence omitted by the court would have denied Wilson the qualified immunity to which he was entitled. Before addressing the specifics of this case, we briefly summarize the doctrine of qualified immunity.

12

Qualified immunity shields public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pauly*, 874 F.3d at 1214 (internal quotation marks omitted). When a defendant asserts a qualified-immunity defense, the plaintiff bears the burden of showing that (1) the defendant violated a constitutional or statutory right, and (2) this right was clearly established at the time of the defendant's unlawful conduct. *See id.* We have discretion to address these two prongs in either order, and "[w]e may resolve a case on the second prong alone if the plaintiff fails to show a right was clearly established." *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016).

The law is clearly established for qualified-immunity purposes only if it was sufficiently clear that, at the time of the public official's conduct, every reasonable official would have understood that the conduct was unlawful. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). To make such a showing in our circuit, "the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Callahan v. Unified Gov't of Wyandotte Cty.*, 806 F.3d 1022, 1027 (10th Cir. 2015) (internal quotation marks omitted). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted). The clarity of the law must be viewed "in light of the specific context of the case, not as a broad general proposition." *Pauly*, 874 F.3d at 1222 (internal quotation marks omitted).

Here, qualified immunity did not completely protect Wilson from Cox's claim. Cox was certainly entitled to an instruction on the unreasonable use of force. The jury could have inferred from the testimony of Officer Klaus and of Ms. Kincaid that, contrary to Wilson's testimony, Cox had not made any attempt to drive his vehicle at Wilson when Wilson shot him, that Cox did not pose a threat of imminent danger to Wilson after Wilson exited his vehicle, and that therefore Wilson's use of deadly force against Cox was unreasonable. But the jury found otherwise. And, in light of the doctrine of qualified immunity, it would have been contrary to law for the jury to hold Wilson liable based on his conduct before the time of the shooting. Therefore, it would have been improper to give the jury an instruction that would have allowed it to do so. We explain.

The sentence omitted from the instruction said: "Defendant Don Wilson's own conduct prior to the shooting can be a part of your determination of reasonableness, but only if his own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." Aplt. App., Vol. I at 57. Cox sought the instruction to allow him to base liability on his claim that, even if Wilson was in imminent danger when he shot Cox, the only reason Wilson was exposed to danger was that he unreasonably exited his police vehicle and approached Cox's pickup.

At trial Cox called as an expert witness a person with excellent credentials who testified that Wilson's recklessness created the danger leading to the shooting. The expert opined that Wilson should not have left his car to approach Cox because of the danger to Wilson once he was on foot on the Interstate and in a vulnerable position between his patrol car and Cox's vehicle. He said that Wilson should have remained in

14

his vehicle and attempted to deescalate the situation, perhaps waiting for support from additional officers. And he said that once Wilson stepped onto the Interstate, he should have moved to a position of safety at the rear of his vehicle.

Perhaps it would have been safer for Wilson to remain in his vehicle. But there were other considerations at play. Cox had ignored repeated warnings from Wilson to turn off his car's engine. Wilson reasonably believed that if Cox could continue to drive on the Interstate, he would present a profound danger to other motorists. Although Cox was temporarily boxed in, there was no reason for Wilson to believe that this situation would persist for any substantial amount of time; Kincaid did not turn off her engine and had not spoken with Wilson or otherwise informed him that she intended to remain stopped in front of Cox indefinitely. If Kincaid moved forward, Cox could have continued his dangerous driving, which, according to both Wilson and Kincaid, he appeared intent on doing. And both Wilson and Kincaid testified that Cox was repeatedly reaching down for something, which they assumed was a firearm. If Cox was to be prevented from further dangerous driving, the most reasonable thing for Wilson to do may have been to expose himself to danger in order to disable Cox from driving.

More importantly, even if the jury was persuaded by the expert's trial testimony that Wilson had acted unreasonably in leaving his vehicle, qualified immunity protected Wilson from liability on that score. As Wilson frames the issue, the question on appeal is whether there is:

> a controlling case finding a Fourth Amendment violation due to the officer's recklessly causing the need to use deadly force, where after participating in a high speed and dangerous chase of a suspect, the officer

15

> exited his vehicle during a temporary stop in traffic to confront the driver with a show of deadly force?

Aplee. Br. at 49. Cox has not presented, nor are we aware of, any opinion by the Supreme Court or this court, or, for that matter, any other court, holding that an officer in similar circumstances acted unreasonably. It would have been error for the district court to instruct the jury that it could find Wilson liable on a ground for which he was protected by qualified immunity.

This court recently reached essentially the same conclusion on an appeal where the issue was the same as in this case—allegedly unreasonable police conduct leading to the use of deadly force. In *Pauly* we reversed the denial of summary judgment in favor of the officers, even though the evidence would support a finding of the following events: Two women called 911 late one evening to report a drunk driver and then began to tailgate him. *See* 874 F.3d at 1203. At one point both vehicles stopped at an exit ramp and the occupants exchanged unpleasantries. *See id.* The driver felt threatened and drove away (apparently without the women following him), going the short distance to his rural home, where he lived with his brother. *See id.* The three responding officers determined "that there was not enough evidence or probable cause to arrest [the driver], and that no exigent circumstances existed at the time. Nevertheless, the officers decided to try and speak with [the driver] to get his side of the story." *Id.* at 1203–04. The officers located and then approached the driver's home, using their flashlights only intermittently until they neared the front door. *See id.* at 1204. The driver and his brother, fearing intruders related to the prior road-rage incident, asked who was approaching, *see id.*; the officers

16

responded hostilely, yelling "Hey, (expletive), we got you surrounded. Come out or we're coming in," *id.* As a result, the brothers, who had no reason to think the intruders were police officers, armed themselves and shouted that they had guns; one of the officers shot and killed the driver's brother after seeing him point a gun in the officer's direction. *See id.* at 1205. We held that the officers' reckless conduct—including approaching the suspect's home "while it was dark and raining and, without knocking on the door, ma[king] threatening comments about intruding into the home," *id.* at 1215—understandably caused the suspect and his brother to arm themselves, and therefore unreasonably created the need to use deadly force, *see id.* at 1211, 1213, 1221. We concluded that the threat "made by the brothers, which would normally justify an officer's use of force, was precipitated by the officers' own" reckless actions, and that therefore the use of deadly force was unreasonable. *Id.* at 1221.

We nevertheless held that the officers were entitled to qualified immunity because there was no clearly established law that such recklessness created liability. *Id.* at 1223. We explained:

> The statement . . . that the reasonableness inquiry includes an evaluation of an officer's actions leading up to the use of force, is absolutely relevant in determining whether a police officer acted unreasonably in effecting a seizure, as we illustrated above. But it cannot alone serve as the basis for concluding that an officer's particular use of excessive force was clearly established. . . . Because there is no case close enough on point to make the unlawfulness of [the shooting officer's] actions apparent, we conclude that [the officer] is entitled to qualified immunity.

*Id.* (internal quotation marks omitted).

17

*Pauly* illustrates the strength of the protection provided by qualified immunity. Unlike Wilson's decision to leave his vehicle to try to disable Cox's vehicle, the impropriety of the alleged actions by the officers before the shooting in *Pauly* would be apparent to most laypersons. Yet the *Pauly* officers were protected by qualified immunity because of the absence of clearly established law prohibiting their conduct. So too, here.

Cox argues that Wilson is procedurally barred from raising qualified immunity on appeal because his preverdict Rule 50(a) qualified-immunity motion was not followed by a postverdict Rule 50(b) motion. *See Kelley v. City of Albuquerque*, 542 F. 3d 802, 817 (10th Cir. 2008) ("[T]he precise subject matter of a party's Rule 50(a) motion—namely, its entitlement to judgment as a matter of law—*cannot be appealed* unless that motion is renewed pursuant to Rule 50(b)." (emphasis added) (internal quotation marks omitted)). But Wilson had no occasion or reason to file a Rule 50(b) motion because the jury's verdict was in his favor. The motion-renewal requirement of Rule 50(b) applies only to parties dissatisfied with the verdict—that is, appellants. Now, as an appellee, Wilson can defend the judgment on any ground supported by the record, at least when it is fair to do so. *See Feinberg v. Comm'r of Internal Revenue*, 916 F.3d 1330, 1334 (10th Cir. 2019), *cert. denied*, 140 S. Ct. 49 (2019). There is no unfairness in affirming on the ground of qualified immunity. Wilson properly invoked qualified immunity in the district court and has fully briefed the issue on appeal.

We also reject Cox's apparent assertion at oral argument that qualified immunity is a separate, nonrelevant issue, and not an issue on appeal, because the jury was not

18

presented with deciding the issue. To begin with, the argument is untimely. "Arguments that are raised for the first time at oral argument come too late to merit our attention." *United States v. DeRusse*, 859 F.3d 1232, 1240 n.3 (10th Cir. 2017) (brackets and internal quotation marks omitted). Moreover, were we to consider this argument, it would fail because the clearly-established-law component of qualified immunity is not a jury issue. *See Griess v. State of Colo.*, 841 F.2d 1042, 1047 (10th Cir. 1988) ("[W]hether constitutional rights allegedly violated were clearly established for purposes of qualified immunity . . . is a purely legal issue," and therefore "is appropriate for resolution on appeal." (internal quotation marks omitted)).

## III. Conclusion

We **AFFIRM** the district court's judgment in favor of Defendant Wilson.