**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**March 2, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

LINDA LENNEN, individually as the
mother of Douglas Burton Oneyear, and as
personal representative of the estate of
Douglas Burton Oneyear, deceased,

     Plaintiff - Appellant,

v.

CITY OF CASPER, WYOMING;
CASPER POLICE OFFICER JONATHAN
SCHLAGER; CASPER POLICE
OFFICER CODY MEYERS,

     Defendants - Appellees,

and

JOHN DOES (11-20) OF THE CASPER
POLICE DEPARTMENT, individually and
as employees/peace officers/instructors;
JOHN DOES (1-10) OF THE  WYOMING
LAW ENFORCEMENT ACADEMY,
individually and as employees/peace
officers/instructors,

     Defendants.

No. 21-8040
(D.C. No. 1:19-CV-00041-SWS)
(D. Wyo.)

_____

**ORDER AND JUDGMENT**[*]

_____

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Before **CARSON**, **BRISCOE**, and **ROSSMAN**, Circuit Judges.

_____

Linda Lennen brought this 42 U.S.C. § 1983 action on behalf of her son, Douglas Oneyear, who was shot and killed by Officers Jonathan Schlager and Cody Meyers of the Casper, Wyoming, Police Department on February 25, 2018.  Lennen asserted two federal law claims under § 1983: (1) Officers Schlager and Meyers used unreasonable excessive force against Oneyear in violation of his constitutional rights under the Fourth Amendment; and (2) the City of Casper (the Officers' employer) negligently failed to train its officers.  She also alleged a wrongful death claim under state law.

The district court granted summary judgment in favor of Officers Schlager and Meyers and the City as to the § 1983 claims and dismissed without prejudice the wrongful death claim.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I**

**A.     Factual Background**

The undisputed relevant facts are as follows:[1]

---

[1] In a claim of excessive force, "the only evidence relevant to the propriety of [the officer's] actions is what [the officer] observed or what he was informed of by others." *Cox v. Wilson*, 971 F.3d 1159, 1166 (10th Cir. 2020).  Accordingly, we focus on what Officers Schlager and Meyers did and what they knew at the time of their challenged conduct.  Furthermore, as in Oneyear's case when the record on appeal contains video evidence of the incident in question, the court is required to accept the non-movant's version of events only to the extent it is not discredited by the record so that no reasonable jury could believe the non-movant's version of events. *Emmett v. Armstrong*, 973 F.3d 1127, 1131 (10th Cir. 2020).

On February 25, 2018, at approximately 11:30 p.m., the Casper Police Department received a call reporting a male wearing black pants or blue jeans and an orange shirt walking in the middle of 15th Street swinging a crowbar.  Aplt. App. at 210.  The male was last reported in the vicinity of 15th Street and Missouri Avenue in Casper, Wyoming.[2]  Casper Police Department Officers Schlager and Meyers responded to the call from dispatch and began searching for the individual.  *Id.* at 150, 228.

At approximately 11:36 p.m., the Casper Police Department received a second call regarding a male who had entered a Loaf 'N Jug convenience store located at 15th Street and Wyoming Boulevard.  *Id.* at 207–08, 228.  The suspect destroyed vending machines, threatened the store clerk with a sword, and assaulted the store clerk by grabbing her face and pushing her down before leaving the store.  *Id.*  The store clerk also reported to dispatch that the male suspect was "talking crazy," "saying all kinds of weird stuff," and asking "what drinks they put the poison in."  *Id.* at 208.  The description of the male at the convenience store was similar to the earlier report of the person swinging a "crowbar."  *Id.* at 228.

---

[2] Agents from the Wyoming Division of Criminal Investigation subsequently determined that the call regarding an individual swinging a "crowbar" took place on 15th Street in the proximity of Wyoming Boulevard.  Aplt. App. at 228.

Upon hearing some of the details of the second call,[3] Officers Schlager and Meyers suspected that the male at the convenience store was likely the same person previously reported swinging a "crowbar." *Id.* at 140–43, 150–51. Officer Meyers further suspected that either the reporting party on the original call or the dispatcher had made a mistake as to the location of the incident. *Id.* at 150.

In response to the second call, Officer Schlager drove toward the convenience store, traveling east on 15th Street. *Id.* at 228. He activated his overhead emergency lights to get around a vehicle traveling in the same direction. *Id.* After passing the vehicle, Officer Schlager deactivated his overhead emergency lights and continued eastbound on 15th Street. *Id.*

Meanwhile, Officer Meyers turned on to 15th Street and could see Officer Schlager's overhead emergency lights on ahead. *Id.* at 151–52. Officer Schlager was approximately ten blocks ahead of Officer Meyers. *Id.* at 230. Officer Meyers turned on his overhead emergency lights, which activated his patrol vehicle's dash camera video

---

[3] As will be discussed, some dispute exists as to what exactly the Officers knew about Oneyear's mental state. Lennen's only evidence that the Officers knew about Oneyear's mental state is the 911 operator's summary report, or computer-aided dispatch ("CAD"), which recorded that the male suspect was "talking crazy," "saying all kinds of weird stuff," and asking "what drinks they put the poison in." Aplt. App. at 207–10. But the City's internal investigation of the dispatch radio calls and the Officers' testimony reveal that dispatch only relayed a description of the suspect's clothing, his physical location, and that he was armed and had assaulted a store clerk. *See, e.g., id.* at 139–42, 232. The concurrence contends that because the record does not indicate that the CAD notes were unavailable to the Officers, Officer Schlager should have been aware of the CAD notes' contents. Concurrence, at 2–3. Regardless, it is undisputed that dispatch conveyed to the Officers that Oneyear had entered the store armed with a sword, broken a bunch of machines, and assaulted the store clerk. Aplt. App. at 232.

and his personal microphone recording. *Id.* at 148–49. The video and audio that Officer Meyers' patrol vehicle and personal microphone captured is the only video/audio evidence in this case. *See* Officer Meyers' Dashcam Video ("Dashcam Video").

As Officer Schlager continued on 15th Street, he saw something moving in the middle of the eastbound lane. *Id.* at 228. He slowed and came to a complete stop on the right-hand side of the road in the eastbound lane. *See* Dashcam Video. Although the scene was dimly lit, Officer Schlager identified a person walking westbound on 15th Street near the entrance to the Quail Run Apartments. *Id.* at 228. Because the person was in reasonably close proximity to the convenience store, Officer Schlager suspected that this person could be the male suspect reported to have assaulted the store clerk while armed with a sword. *Id.* at 141.

At approximately 11:39 p.m., Officer Schlager radioed dispatch that he would "be out with that male walking in the street in front of Quail Run." Dashcam Video, at 2:07–2:11.[4] He then activated his overhead emergency lights. *Id.* at 2:15. As Officer Schlager stopped his vehicle, the individual was at a distance concealed in the shadows but can be seen moving toward Officer Schlager's vehicle. Aple. Supp. App. Vol. I at 50. Officer Schlager approached the person, later identified as Douglas Oneyear, and began by saying, "Hi, I'm Officer Schlager," in an attempt to engage Oneyear in conversation. *Id.* at 50; Aplt. App. at 228. Officer Schlager then noticed a reflection from the blade of a sword, which alerted him that "the subject was armed." Aplt. App. at 142–43, 228.

---

[4] The Dashcam Video timestamps refer to the time elapsed since the start of Officer Meyers' dashcam recording.

Around this time, Officer Meyers arrived at the scene and stopped his patrol vehicle just to the left and behind Officer Schlager's patrol vehicle in the eastbound lane so that the two vehicles were staggered. Dashcam Video, at 2:16–2:20. From here, the events leading to Oneyear's death occurred very quickly, all within about ten seconds:

**2:20–2:21:** Officer Schlager stopped walking near the front driver's side bumper of his vehicle while Officer Meyers exited his car. Officer Schlager testified that he did not observe firsthand or hear anything about Oneyear from dispatch that would lead him to believe that Oneyear was drunk, high, mentally ill, or emotionally unstable. Aple. Supp. App. Vol. I at 60–61.

**2:22–2:23:** Officer Schlager yelled, "Drop the sword!", and began backpedaling along his vehicle while Officer Meyers exited his vehicle. Officer Schlager had his gun drawn and pointed at Oneyear as he backed up.

**2:23–2:24:** Oneyear, who cannot be seen in the video yet because he was in front of Officer Schlager's car, yelled back at Officer Schlager. His response on the recording is unclear due to conflicting background noise, but the word "gun" at the end of his statement is clear. Officer Schlager believed that Oneyear had said something to the effect of, "I know you don't have a fucking gun." Aplt. App. at 228. Officer Meyers testified that he could not recall specifically what Oneyear said but that he could sense anger and defiance in Oneyear's voice and interpreted it as "[t]his guy is not going to listen to any of our commands." *Id.* at 153. Officer Meyers further testified that he recalled processing whatever Oneyear said in response to Officer Schlager's commands as a "fuck you" response to Officer Schlager. *Id.*

**2:24–2:25:** Oneyear is seen for the first time on the video. He was in front of Officer Schlager's driver's side headlight and walking very quickly toward Officer Schlager.

**2:24–2:25:** Officer Schlager yelled, "Drop the sword now, sir!", as he continued to retreat along the driver's side of his vehicle. Officer Schlager testified that at this point he was unaware that Officer Meyers had arrived on the scene and believed that he was alone dealing with a rapidly approaching armed suspect. Aple. Supp. App. Vol. I at 56–57.

**2:25–2:26:** Officer Meyers radioed to dispatch, "302 [Meyers' Unit Number], one at gunpoint."

**2:26–2:27:** A long, thin object can be seen in Oneyear's right hand as he cast a shadow blocking Officer Schlager's driver's side headlight. Oneyear was holding the object low to the side, not raised. The object reflected the light and appeared to be metal or metallic in color. Officer Meyers testified that he was unsure of the exact nature of the weapon but "knew it had some sort of edge on it or it was heavy or sharp, based on how [Oneyear] was carrying it." Aple. Supp. App. Vol. I at 127. Officer Meyers saw Oneyear approaching Officer Schlager with his arm down, "bicep facing forward to do almost an upward swing" with the weapon. *Id.* He believed Oneyear was holding the weapon in a way so that it was ready to be "swung" or used. Aplt. App. at 153.

**2:27–2:28:** Officer Schlager yelled, "Now!" Officer Meyers yelled, "Drop it!"

**2:28:** Officer Meyers' hands can be seen on the left side of the video for the first time as he moved forward with his drawn gun pointed at Oneyear, but Officer Meyers was still several feet behind Officer Schlager.

**2:25–2:28:** Oneyear continued to walk very briskly directly toward Officer Schlager. Oneyear never slowed his advance, stopped, dropped the sword, or indicated compliance with the Officers' directions in any way. Officer Schlager testified that he was in fear for his life, as Oneyear appeared to be fixated on him and was walking in a determined manner with his sword out to his side. Aplt. App. at 228; Aple. Supp. App. Vol. I at 60. Officer Meyers testified that as he attempted to get a better angle of approach on Oneyear, he reached a point where he believed Oneyear was too close and that Oneyear could have taken a step toward Officer Schlager and easily swung and hit Officer Schlager with the weapon. Aple. Supp. App. Vol. I at 127–29. Officer Meyers also believed, at that moment, that Oneyear's approach was "aggressive" and that he was "walking out of anger" based on his tense muscle tone, posture of leaning forward, and his determination. *Id.* Officer Meyers believed that Oneyear was "going for Officer Schlager," which was a shock to Officer Meyers because in his past experience armed suspects "ditch the weapon and run" when they encounter officers. *Id.* at 136. He was scared for himself and Officer Schlager and did not "want to see [his] partner die that day." *Id.* at 127, 137.

**2:28–2:29:** The Officers fired a total of three shots at Oneyear in quick succession.  Officer Schlager appeared to fire the first shot.

**2:29–2:30:** Oneyear fell to the ground, and the object came loose from his hand next to him.  He fell near the front driver's side tire of Officer Schlager's vehicle.  Officer Schlager stood at the rear driver's side of his vehicle while Officer Meyers stood to the left and a few feet behind Officer Schlager.

**2:31–2:32:** Officer Meyers reported to dispatch, "302, shots fired."

**2:34–2:43:** Both Officers instructed Oneyear, "Show us your hands." Oneyear moved slightly on the ground but did not otherwise respond to the Officers in a manner that could be seen or heard on the video.

Officer Meyers then confirmed their location with dispatch again, and the Officers approached Oneyear.  Dashcam Video, at 2:53–3:04.  Officer Schlager moved the sword away from Oneyear and placed him in handcuffs, and the Officers proceeded to render medical aid including packing the wounds until other officers and EMTs arrived.  *Id.* at 3:04–10:16.  At that time, Officers Schlager and Meyers were instructed to step away and were told that they would be kept out of the loop moving forward because the Wyoming Division of Criminal Investigation would take over and investigate the shooting.  *Id.* at 10:16–11:23.  At 11:50 p.m., EMTs pronounced Oneyear deceased.  Neither Officer had ever met Oneyear prior to this interaction.

**B.    Procedural History**

On February 25, 2019, Lennen initiated this action by filing a complaint against the City of Casper (City of Casper Police Department and Wyoming Law Enforcement Academy) and Officers Schlager and Meyers, in their official and

8

individual capacity, alleging (1) excessive force under 42 U.S.C. § 1983,
(2) negligent failure to train by the City of Casper Police Department, (3) and a state
law claim for wrongful death. The City and Officers Schlager and Meyers, in their
official capacity, moved for summary judgment.  Officers Schlager and Meyers, in
their individual capacity, also filed a motion for summary judgment claiming
qualified immunity on both the excessive force and wrongful death claims.

The district court entered an order granting in part and denying in part
defendants' motions for summary judgment.  As regards Lennen's § 1983 claims, the
district court granted summary judgment in favor of Officers Schlager and Meyers
and the City.  The district court declined to exercise supplemental jurisdiction over
Lennen's state law wrongful death claim and dismissed that claim without prejudice.

In viewing the evidence in the light most favorable to Lennen, the district
court determined that the *Graham* factors (*Graham v. Connor*, 490 U.S. 386 (1989))
and the *Estate of Larsen* subfactors (*Estate of Larsen ex rel. Sturdivan v. Murr*, 511
F.3d 1255 (10th Cir. 2008)) weighed in the Officers' favor and against Lennen's
claim of excessive force.  The district court stated that "[g]iven the circumstances, a
reasonable officer could have believed that [Oneyear] posed an immediate threat of
serious physical injury or death to the officers in the time leading up to and at the
precise moment he was shot." Aplt. App. at 280.  The district court therefore
concluded that the actions of Officers Schlager and Meyers were objectively
reasonable in light of the facts and circumstances presented and that Lennen had not

9

shown that the Officers used excessive, unreasonable force against Oneyear in violation of his Fourth Amendment rights.

Based on this reasonableness inquiry, the district court determined that the Officers were entitled to qualified immunity because Lennen could not show a constitutional violation. In rendering its decision, the district court pointed out that Lennen had alleged numerous facts that were not supported by the record or were contradicted by the record. The district court acknowledged that because the Dashcam Video was available in Lennen's case, the district court was required to accept Lennen's version of events only to the extent it is not discredited by the record so that no reasonable jury could believe Lennen's version of events (citing *Emmett*, 973 F.3d at 1131). Therefore, the district court was not required to accept unsupported facts or facts that were contradicted by the record, specifically the Dashcam Video.

For the sake of completeness, the district court also addressed the second prong of the qualified immunity analysis. The district court determined that Lennen had not shown that the law was clearly established on February 25, 2018, such that it would have put every reasonable officer in Officers Schlager and Meyers' positions on reasonable notice that their conduct violated Oneyear's Fourth Amendment rights. The district court specifically determined that *Sevier v. City of Lawrence, Kansas*, 60 F.3d 695 (10th Cir. 1995), *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997), and their progeny did not place Officers Schlager or Meyers on reasonable notice that their conduct toward Oneyear in this case violated a constitutional right. The district

court concluded by reiterating that Officers Schlager and Meyers were entitled to qualified immunity against Lennen's individual capacity claims and that the City was entitled to summary judgment regarding Lennen's failure-to-train claim because "the lack of a Fourth Amendment violation by the officers precludes any claim that they were improperly trained."  Aplt. App. at 295.

Lennen filed a timely appeal to this court.

## II

Lennen argues that Officers Schlager and Meyers used unreasonable excessive force against Oneyear in violation of his constitutional rights under the Fourth Amendment and that the City of Casper/Casper Police Department was deliberately indifferent to the training and supervision of its officers in the use of less than lethal force.  Specifically, Lennen asserts that the district court erred in granting summary judgment in favor of Officers Schlager and Meyers and the City because (1) some of the district court's factual findings and conclusions regarding the Officers' conduct are unsupported by the evidence or contrary to the evidence; and (2) the district court erred by relying on these findings and "the subjective thoughts, feelings, and beliefs" of the Officers in its determination that their actions were "objectively reasonable." Lennen further argues that because the Officers violated Oneyear's constitutional rights, the district court erred in holding that the cases of *Sevier v. City of Lawrence, Kansas*, *Allen v. Muskogee*, and their progeny did not place the Officers on reasonable notice that their conduct toward Oneyear in this case violated his constitutional rights.  Officers Schlager and Meyers and the City respond that

11

Oneyear's constitutional rights were not violated and the Officers are entitled to qualified immunity.

The doctrine of qualified immunity shields officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). A defendant's assertion of qualified immunity from suit under 42 U.S.C. § 1983 results in a presumption of immunity. *Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020). A plaintiff "can overcome this presumption only by showing that (1) the officers' alleged conduct violated a constitutional right, and (2) it was clearly established at the time of the violation, such that 'every reasonable official would have understood,' that such conduct constituted a violation of that right." *Reavis ex rel. Estate of Coale v. Frost*, 967 F.3d 978, 984 (10th Cir. 2020) (internal quotation marks omitted).

Lennen alleges that the Officers' use of excessive force violated Oneyear's Fourth Amendment rights. *See Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014). To state an excessive force claim under the Fourth Amendment, Lennen "must show *both* that a seizure occurred and that the seizure was unreasonable." *Thomas v. Durastanti*, 607 F.3d 655, 663 (10th Cir. 2010) (internal quotation marks omitted). Seizure by use of deadly force is subject to the Fourth Amendment's reasonableness requirement. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). The reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. In other words,

12

"[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

The reasonableness inquiry in an excessive force case is objective and involves a "totality of the circumstances" analysis because "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397; *Garner*, 471 U.S. at 8–9. When considering "the facts and circumstances of each particular case," courts specifically consider three factors the Supreme Court outlined in *Graham*: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. Tenth Circuit precedent instructs that courts also should consider four nonexclusive factors in assessing the threat posed by a suspect: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen*, 511 F.3d at 1260.

Moreover, to succeed in a § 1983 claim against a municipality, Lennen must show two elements: "(1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation."

*Cordova v. Aragon*, 569 F.3d 1183, 1193 (10th Cir. 2009).  Municipal liability based on inadequate training requires proof of "deliberate indifference."  *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).  The deliberate indifference standard "may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."  *Id.*

### A.    The Officers' Conduct

Lennen first argues that the district court erred in some of its factual findings and conclusions regarding whether the evidence showed that the Officers' conduct violated Oneyear's constitutional rights, which is a threshold issue for both the excessive force/qualified immunity and failure-to-train claims.

We review a grant of summary judgment based on qualified immunity de novo, applying the same legal standard used by the district court.  *Reeves v. Churchich*, 484 F.3d 1244, 1250 (10th Cir. 2007).  A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In applying this standard, the court construes the evidence in the light most favorable to Lennen as the nonmoving party and resolves all factual disputes and reasonable inferences in favor of Lennen.  *McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).  However, this is only true insofar as "there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the

14

evidence presented." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013) (internal quotation marks omitted).

In cases where defendants have moved for summary judgment based on qualified immunity, as did Officers Schlager and Meyers, the district court still must view the facts in the light most favorable to Lennen and resolve all factual disputes and reasonable inferences in favor of Lennen. *See id*; *Booker*, 745 F.3d at 411. Thus, when presented with a motion for summary judgment asserting qualified immunity, qualified immunity is proper when the record plainly demonstrates that no constitutional right has been violated. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). Since qualified immunity is not a defense available to a municipal defendant, the municipality bears the usual summary judgment burden of showing the absence of any genuinely disputed material fact—that is, the City has the burden of proving the lack of a constitutional violation. Accordingly, when resolving the present questions of excessive force/qualified immunity and failure-to-train, we must resolve the threshold question of whether the record shows that the conduct of Officers Schlager and Meyers violated a constitutional right. *See Scott*, 550 U.S. at 377–78; *Cordova*, 569 F.3d at 1193.

To assess the constitutionality of the Officers' actions, we must first determine the relevant facts. *Scott*, 550 U.S. at 378. In Lennen's case, video evidence—the Dashcam Video—exists in the record "depicting the events as they occurred." *Carabajal v. City of Cheyenne, Wyoming*, 847 F.3d 1203, 1207 (10th Cir. 2017) (citing *Scott*, 550 U.S. at 380). No party has challenged the authenticity or accuracy

15

of the Dashcam Video.  We therefore accept Lennen's "version of the story to the extent that it is not 'so utterly discredited by the record that no reasonable jury could have believed [her].'"  *Emmett*, 973 F.3d at 1131 (quoting *Scott*, 550 U.S. at 380).  When we rely on the video evidence here, we continue to view that evidence, as all other proper evidence, in the light most favorable to Lennen.  *Carabajal*, 847 F.3d at 1207.

Lennen alleges that the record shows the following facts about the Officers' conduct: (1) the Officers knew that Oneyear was mentally or emotionally disturbed; (2) the Officers aggressively confronted Oneyear or approached him in a threatening manner; (3) the Officers forced their way into a confrontation with Oneyear in a confined space; (4) Officer Schlager did not know that Oneyear was armed and striding toward him until he got out and moved in front of his vehicle; (5) Oneyear was farther than approximately thirty feet away when shot; and (6) the Officers created the situation warranting the use of deadly force with their aggressive approach.

We conclude that the record, in particular the Dashcam Video, does not support Lennen's version of the facts and that her assertions are "so utterly discredited by the record that no reasonable jury could have believed [her].'" *Emmett*, 973 F.3d at 1131 (quoting *Scott*, 550 U.S. at 380).  The record and the Dashcam Video do not support her allegations regarding the Officers' conduct.  Lennen argues, for instance, that the record clearly demonstrates that the Officers knew that Oneyear was mentally or emotionally disturbed and therefore they should

16

have taken a different approach.  Aplt. Br. at 15.  In support, Lennen points to the 911 operator's summary report (the CAD notes) of the convenience store clerk's call reporting that the suspect was talking "crazy talk" and "asked her what drinks they put the poison in."  Aplt. App. at 207–10.  However, we cannot determine from this operator's summary whether the Officers were made aware of these comments when they received the calls from dispatch, and the City's internal investigation of the radio calls and the Officers' testimony reveal that dispatch only relayed a description of the suspect's clothing, his physical location, and that he was armed and had assaulted a store clerk.  *See, e.g.*, *id.* at 139–42, 232.  The record also shows that neither Officer had met Oneyear before this incident, so they did not have previous knowledge if he had any alleged mental illness, suicidal tendencies, or other emotional instability.  Even if we assumed that dispatch communicated this information to the Officers and the Officers were aware of these comments, the events as they unfolded gave the Officers little if any opportunity to take a more ameliorative approach, and as will be discussed, the reasonableness of use of force is based on the perspective of a reasonable officer on the scene, not with the benefit of hindsight.  *Graham*, 490 U.S. at 396.

Lennen's other contentions are based on misstatements of fact or are plainly contradicted by the Dashcam Video.  Lennen argues evidence shows that the Officers aggressively confronted Oneyear and screamed instructions at him even though Oneyear "never changed pace or direction nor made any threatening gesture toward them."  Aplt. Br. at 15.  But the record indicates that Officer Schlager initially

17

approached Oneyear to introduce himself and only after Oneyear rapidly advanced toward him with a sword did Officer Schlager issue commands to drop the sword. Aple. Supp. App. Vol. I at 50; Dashcam Video, at 2:22–2:28. Lennen argues that the Officers forced their way into a confrontation in a confined space with Oneyear because they blocked his path and trapped him between a plowed snowbank on his right and the snow-covered ground on his left. Aplt. Br. at 16. But the Dashcam Video shows that Oneyear was in the middle of a public street when he encountered Officer Schlager and that Oneyear could have freely turned and walked back toward the convenience store, exited to his left into Quail Run Apartments, or turned to his right and walked south without obstruction. Dashcam Video, at 2:05–2:27. Lennen argues that the Dashcam Video "in conjunction with the crime scene photographs" show that Oneyear was farther than thirty feet away when shot. Aplt. Br. at 19–20. But again, the Dashcam Video clearly shows that Oneyear and Officer Schlager were approximately the length of Officer Schlager's vehicle from each other when the shooting occurred and that Oneyear was within a stride or two of being able to strike Officer Schlager with the sword, which is further supported by Officer Meyers' testimony. Dashcam Video, at 2:24–2:30; Aplt. App. at 277; Aple. Supp. App. Vol. I at 127. Furthermore, the crime scene photographs do not contradict the Dashcam Video. *See* Aplt. App. at 239–43.

We therefore conclude that the record does not support Lennen's version of the facts regarding the Officers' conduct.

**B.**    **"Objectively Reasonable" Analysis**

Lennen next argues that the district court erred by relying on (1) the aforementioned findings regarding the Officers' conduct and (2) "the subjective thoughts, feeling, and beliefs" of the Officers in its determination that the Officers' actions, under the totality of the circumstances, were "objectively reasonable" and therefore constitutionally permissible.

To assess whether force, particularly deadly force, was used in violation of the Fourth Amendment, this court employs two complementary frameworks: *Graham*, 490 U.S. at 396, and *Estate of Larsen*, 511 F.3d at 1260.  *Estate of Larsen* provides additional guidance as to the second *Graham* factor, which is "undoubtedly the most important and fact intensive factor."  *Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017) (internal quotation marks omitted).

Here, in claiming that the Officers' actions were not objectively reasonable, Lennen rehashes many of the same arguments discussed in the previous section that are contradicted by the record and the Dashcam Video.  For instance, Lennen asserts that the Officers issued only two warnings to Oneyear to "drop the sword," but the Dashcam Video audio captures the Officers issuing a total of four commands.  Dashcam Video, at 2:22–2:28 ("Drop the sword!"; "Drop the sword now, sir!"; "Now!"; and "Drop it!").  Lennen also asserts that Oneyear "was just walking down the street when confronted by the officers and it wasn't until the officers deliberately stood in and blocked his path that he was coming toward them," but the Dashcam Video shows that Oneyear was not

blocked in and instead rapidly advanced toward Officer Schlager. *Compare* Aplt. Br. at 23–24, *with* Dashcam Video, at 2:22–2:30.

Applying the *Graham* and *Estate of Larsen* factors to the circumstances Oneyear presented, we conclude that the Officers' conduct was objectively reasonable. Considering the first *Graham* factor ("the severity of the crime at issue"), Oneyear had previously swung a crowbar at a car driving in the street, which prompted a 911 call. Minutes later, still armed, Oneyear assaulted a clerk at the Loaf 'N Jug. When Officer Schlager encountered Oneyear on 15th Street, Oneyear rapidly advanced toward him while still armed with a sword. The two reported armed and violent crimes, Oneyear's posture, his bearing, his single response to Officer Schlager, and the speed of his approach toward Officer Schlager leads to this factor weighing heavily in the Officers' favor.

Considering the second *Graham* factor ("whether the suspect posed an immediate threat to the safety of the officers or others"), in conjunction with the *Estate of Larsen* factors, the record shows that (1) the Officers ordered Oneyear four times to drop his sword or stop, and Oneyear never complied; (2) while Oneyear did not raise his sword as if to strike in a downward manner, Oneyear's continued aggressive advance toward Officer Schlager and his disregard of the Officers' commands further demonstrated his hostile intent, and the Officers believed he was holding the weapon in such a way that he was ready to use it; (3) when the Officers shot Oneyear, Oneyear was approximately a car length away from Officer Schlager and was within a stride or two of being able to strike Officer Schlager with his sword; and (4) the tone of Oneyear's verbal statement to

20

Officer Schlager was obstinate, and his manifest actions, demeanor, and body language demonstrated an intent to aggressively and quickly close in on Officer Schlager while refusing to drop his sword. This factor also weighs in the Officers' favor.

Considering the third *Graham* factor ("whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight"), the Officers were not attempting to arrest Oneyear but were trying to conduct an investigatory detention regarding a reported aggravated assault with a weapon. Oneyear fit the description of the suspect, was seen carrying the sword once the Officers arrived on scene, refused commands to stop and drop the sword, and approached the Officers in a manner indicative of a hostile intent. Taken together, the Officers had probable cause to believe that Oneyear posed a threat of serious harm to either the Officers or others. The *Graham* and *Estate of Larsen* factors therefore weigh in favor of Officers Schlager and Meyers.

But both Lennen and the concurrence assert that even when an officer uses deadly force in response to a clear threat of such force being employed against him, the *Graham* inquiry does not end there. Aplt. Br. at 21–22; Concurrence, at 3–7. Relying on the danger creation theory rooted in *Sevier* and reiterated in *Allen*, the concurrence contends that we should take the additional step of inquiring "whether the officer['s] own reckless or deliberate conduct during the seizure unreasonably created the need to use such

force."[5]  Concurrence, at 6–7 (citing *Sevier* and *Allen*) (internal quotations and citations

omitted).  The concurrence reasons that if Officer Schlager knew Oneyear "pos[ed] no

imminent threat of harm to the public" yet "confronted Mr. Oneyear head on" without

maintaining a safe time, distance, and/or cover, "the foreseeable consequence of his

approach should have been obvious: if the suspect did not immediately stop as directed,

then Officer Schlager would have to shoot him."  *Id.* at 3–4.

This reliance on *Sevier* and *Allen* is misguided.  The Supreme Court recently ruled

per curiam that the legal principle outlined in *Sevier*—that an officer's deliberate and

reckless pre-seizure conduct can render a later use of force excessive—was "merely

noted in dicta" and "[t]o state the obvious, a decision where the court did not even have

jurisdiction cannot clearly establish substantive constitutional law."  *City of Tahlequah,*

*Oklahoma v. Bond*, 142 S. Ct. 9, 12 (2021) (per curiam).  The Supreme Court further

implied that any reliance on *Allen* to determine whether an officer's conduct "was

reckless or that [his] ultimate use of force was unlawful" required factual symmetry.  *Id.*

at 12.  In *Allen*, the officers responded to a potential suicide call by sprinting toward a

parked car, screaming at the suspect, and attempting to physically wrest a gun from his

---

[5] In support, the concurrence cites a line of cases that rely on *Sevier* and *Allen*:
*Estate of Taylor v. Salt Lake City*, 16 F.4th 744, 762 (10th Cir. 2021) (citing *Sevier*,
*Allen*, and *Bond v. City of Tahlequah*, 981 F.3d 808, 820 (10th Cir. 2020), *cert. granted*,
*judgment rev'd*, 142 S. Ct. 9 (2021)); *Estate of Valverde ex rel. Padilla v. Dodge*, 967
F.3d 1049, 1067 (10th Cir. 2020) (citing *Sevier* and *Allen* but noting that "it is unclear
from recent Supreme Court authority where the Court stands on the matter"); and *Estate*
*of Ceballos v. Husk*, 919 F.3d 1204, 1217 (10th Cir. 2019) (citing *Sevier* and engaging in
a factual comparison with *Allen* to determine if it provided clearly established guidance
to an objective officer in a factually similar situation).

hands. 119 F.3d, at 841. Here, in contrast, Officer Schlager responded to a call about an armed suspect who had assaulted a store clerk by attempting to engage Oneyear in conversation, retreating once Oneyear rapidly and aggressively advanced toward him while armed, and discharging his weapon only after he issued multiple warnings for Oneyear to drop his sword. Even if we assume that such a legal principle exists, there is no factual symmetry between *Allen* and the present case, which the concurrence acknowledges. *See* Concurrence, at 7–8.

Finally, Lennen also claims that the district court improperly considered the "subjective thoughts, feelings, and beliefs" of the Officers as part of the "objectively reasonable" analysis. Aplt. Br. at 28–29. Lennen's only evidence in support of this argument is that the district court used the following language in its opinion: the "[o]fficers reported/suspected (thought, assumed)," "reported/believed," and "started to say." *Id.* at 29. This argument is unpersuasive, as such references went to nothing more than background for what the Officers knew and did not apply to the district court's "objectively reasonable" analysis.

We conclude that the *Graham* and *Estate of Larsen* factors weigh in favor of the Officers, and therefore in light of the totality of the circumstances, their conduct was objectively reasonable. As such, Oneyear's Fourth Amendment rights were not violated. Without a constitutional violation, Lennen fails to meet the first prong of the qualified immunity analysis, and we need not address the second prong of the qualified immunity analysis regarding clearly established law or Lennen's claim that the City is liable for its

23

failure to properly train its officers.[6] Because the Officers did not use excessive force and therefore did not violate Oneyear's constitutional rights, Lennen's § 1983 claims of excessive force and failure-to-train fail, and the district court correctly entered summary judgment in favor of Officers Schlager and Meyers and the City.

## III

For the foregoing reasons, we AFFIRM.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

---

[6] But if we were to also address these issues, our conclusion would mirror those aptly set forth in the concurrence.

*Lennen v. City of Casper*, No. 21-8040

**ROSSMAN**, J., concurring.

I respectfully concur in affirming the district court's grant of summary judgment, though not on the same ground as the majority.

This appeal concerns the killing by police of Ms. Lennen's son—a 36-year-old dependent with a long history of mental health issues, including schizoaffective disorder. [Aplt. App. at 245.] He often developed strong attachments to inanimate objects—most recently, a prop sword from the movie "The Highlander," which he had been dragging around and using as a walking stick. [*Id.*] To be sure, the officers could not have known these things about him. Even so, the district court's sound sentiment bears repeating at the outset: "The Court sympathizes with Ms. Lennen over the heartbreaking and far-too-early death of her son. Everyone involved or touched by this tragedy wishes the events would have played out differently." Aplt. App. at 302.

Recall, the standard of review requires us "to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (alteration in original) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts," *id.*, unless it is "blatantly contradicted by the record, so that no reasonable jury could believe it," *id.* at 380. Adhering to that standard, I cannot join the majority in affirming the district court on the ground that there was no constitutional violation.

In my view, a reasonable jury could believe (1) Officer Schlager knew Mr. Oneyear was distraught or otherwise irrational; (2) Officer Schlager is at least partially responsible for creating the lethal situation; (3) Mr. Oneyear made no hostile motions with the sword; (4) he was not within striking distance; and (5) he was not resisting arrest. With this view of the facts, I cannot say with any confidence, as the majority does, that Ms. Lennen would be unable to establish a constitutional violation.

There is nonetheless a readily discernible ground for affirmance. The Supreme Court recently recognized that any constitutional violation in this case was not clearly established under our precedent. *See City of Tahlequah v. Bond (Bond II)*, 142 S. Ct. 9 (2021). This court may address either prong of the qualified immunity test first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). It seems appropriate here— particularly where genuine disputes of fact undermine the conclusion that no constitutional violation occurred—to affirm the grant of summary judgment to the officers under the second prong of qualified immunity.

I.    **Genuine disputes of fact undermine the conclusion that no constitutional violation occurred.**

A.    **Ms. Lennen's factual challenges.**

Perhaps most significantly, I agree with Ms. Lennen that, viewing the evidence in the light most favorable to her, Officer Schlager knew, before he used deadly force, that Mr. Oneyear was distraught or otherwise irrational. *See Estate of Ceballos v. Husk*, 919 F.3d 1204, 1217 (10th Cir. 2019) ("[T]he responding officers knew Ceballos's capacity to reason was diminished, whatever the underlying reason might

2

have been—mental health problems, emotional distress, drunkenness or drugs."). That's because the evidence indicates Officer Schlager was aware of the computer-aided dispatch (CAD) notes, which included the clerk's report that Mr. Oneyear was "talking 'crazy talk'" and "ask[ing] what drinks they put . . . poison in." Aplt. App. at 208.

The district court found as much. Aplt. App. at 266 ("Dispatch relayed the complaint to officers, reporting that a male wearing a red hoodie had entered the store 'with a sword' . . . [was] talking 'crazy talk,' and had asked the clerk 'what drink they put poison in[.]'"). The defendants never challenged that finding on appeal—and for good reason. Officer Schlager testified at his deposition that he *did* receive the dispatch report through his computer. Aplee. Supp. App. at 36 ("I don't recall specifically if it was – if it was given over the radio, but it was on the computer."). Notwithstanding this evidence, the majority concludes we cannot determine whether Officer Schlager was made aware of the CAD notes, citing the City's internal investigation and the officers' testimony. I read the record differently. The "internal investigation" is just a transcript of the radio call—it does not say the CAD notes were for some reason unavailable to the officers.

I also agree with Ms. Lennen that Officer Schlager was at least partially responsible for creating the situation warranting the use of deadly force by not maintaining a safe time, distance, and/or cover. Viewing the evidence in the light most favorable to Ms. Lennen, Officer Schlager knew an irrational suspect armed with a sword was walking down the middle of an empty street, at night during a

3

snowstorm, posing no imminent threat of harm to the public. Rather than keep his distance, take cover, or move out of the suspect's path, Officer Schlager confronted Mr. Oneyear head on. Officer Schlager faced a rapidly developing situation, but the foreseeable consequence of his approach should have been obvious: if the suspect did not immediately stop as directed, then Officer Schlager would have to shoot him. And that is precisely what happened here, less than ten seconds into the encounter. Under these circumstances, a reasonable jury could find that Officer Schlager was partially responsible for creating the situation warranting the use of deadly force.

### B.    The *Graham* and *Estate of Larsen* factors.

I agree with the majority that the first *Graham* factor—severity of the crime—and two *Estate of Larsen* subfactors—failure to comply with orders to drop the weapon and the suspect's manifest intentions—weigh in the officers' favor. But, unlike the majority, I believe a reasonable jury could find that other factors favor Ms. Lennen. I offer a few examples.

Take the second *Estate of Larsen* factor, "whether any hostile motions were made with the weapon towards the officers." *Estate of Larsen ex rel. Sturdivan v. Murr*, 51 F.3d 1255, 1260 (10th Cir. 2008). Viewing the evidence in the light most favorable to Ms. Lennen, Mr. Oneyear made no hostile motions with the sword. The majority agrees Mr. Oneyear "did not raise his sword as if to strike in a downward manner" yet still finds Mr. Oneyear demonstrated "hostile intent." Maj. Op. at 20. "Hostile intent" is the majority's language; *Estate of Larsen* focuses precisely on "hostile motions . . . with the weapon." *Estate of Larsen*, 51 F.3d at 1260. In any

4

event, the majority concludes "the Officers believed [Mr. Oneyear] was holding the weapon in such a way that he was ready to use it." Maj. Op. at 20. This finding is belied by the record and gives too much credit to the officers' subjective interpretation. A reasonable juror watching the dashcam video could find Mr. Oneyear was not advancing aggressively toward Officer Schlager and was holding the sword down by his side in a non-threatening manner—not in a ready position, but likely as he was holding it before he encountered the officers. *See Tenorio v. Pitzer*, 802 F.3d 1160, 1163 (10th Cir. 2015) (noting district court's conclusion that this factor favored victim where jury could find that victim was holding "knife loosely by his thigh and that he made no threatening gesture toward anyone").

Next, the majority incorrectly concludes the third *Estate of Larsen* factor—the distance separating the officers and the suspect—favors the officers. The majority finds Mr. Oneyear "was within a stride or two of being able to strike Officer Schlager with his sword." Maj. Op. at 20. This arguably underestimates the distance.[1] Regardless, the point is Mr. Oneyear was not within striking distance of Officer Schlager, and thus, a reasonable juror could find this factor weighs against the officers. *See Tenorio*, 802 F.3d at 1164-65 (noting district court's conclusion that

---

[1] Crime scene photographs depict Mr. Oneyear lying several feet in front of Officer Schlager's vehicle suggesting he was more than a car length away from Officer Schlager—and more than two strides away from striking distance—when shot. *See* Aplt. App. at 239–43. The majority dismisses these photos without explanation. Maj. Op. at 18.

5

jury could find this factor favored victim where victim was shot "before he was within striking distance").

Finally, the third *Graham* factor, whether the suspect is "actively resisting arrest or attempting to evade arrest by flight," also weighs in Ms. Lennen's favor. The district court found, and no one has disputed, "the officers were not attempting to arrest Mr. Oneyear." Aplt. App. at 279. The majority agrees Mr. Oneyear was not evading arrest but finds this factor favors the officers because they "were trying to conduct an investigatory detention regarding a reported aggravated assault with a weapon." Maj. Op. at 21. That is beside the point. "If the officers had no intent to arrest [Mr. Oneyear], he could not have been actively resisting arrest or attempting to evade arrest by flight . . . ." *Bond v. City of Tahlequah* (*Bond I*), 981 F.3d 808, 820 (10th Cir. 2020), *rev'd on other grounds by Bond II*, 142 S. Ct. 9. Thus, a reasonable juror could find this factor supports Ms. Lennen.

But this is not the end of the analysis. "[E]ven when an officer uses deadly force in response to a clear threat of such force being employed against him, the *Graham* inquiry does not end there." *Estate of Taylor v. Salt Lake City*, 16 F.4th 744, 762 (10th Cir. 2021) (alteration in original) (citation omitted). "Specifically, we properly inquire 'whether the officer['s] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Id.* (alteration in original) (quoting *Estate of Valverde ex rel. Padilla v. Dodge*, 967 F.3d 1049, 1067 (10th Cir. 2020)). Viewing the evidence in the light most favorable to Ms. Lennen, Officer Schlager arguably acted recklessly by "approach[ing] the situation in a

6

manner [he] knew or should have known would result in escalation of the danger." *Bond I*, 981 F.3d at 816 (citation omitted).

Guided by a methodical application of the standard of review, which means adopting much of Ms. Lennen's version of the facts, I respectfully do not join the majority in holding Officer Schlager did not violate Mr. Oneyear's constitutional rights. Nevertheless, I agree affirmance is required because any constitutional violation was not clearly established.

## II.    Any constitutional violation was not clearly established.

Ms. Lennen contends the district court erred in holding *Sevier v. City of Lawrence*, 60 F.3d 695 (10th Cir. 1995), and *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997), did not place the officers on notice their conduct violated the Constitution. According to Ms. Lennen, these cases clearly establish a constitutional violation here, where "officers knowingly confronted a potentially irrational subject who was armed only with a weapon of short-range lethality and deliberately blocked his path giving themselves and their suspect merely seconds to react before killing him." Aplt. Br. at 30. The Supreme Court's recent decision in *Bond II* forecloses Ms. Lennen's argument.[2]

In *Bond II*, officers shot an intoxicated man after they followed him into his ex-wife's garage, he grabbed a hammer, and then he took a stance as if he would

---

[2] The Supreme Court decided *Bond II* on the same day the Appellees' response briefs were due in this court. Before oral argument, we requested, and the parties provided, supplemental briefing on how *Bond II* affects the disposition on appeal.

throw it or charge at them. The Supreme Court concluded *Sevier*, *Allen*, and their progeny did not "come[] close to establishing that the officers' conduct was unlawful." *Bond II*, 142 S. Ct. at 12. First, the Court thought it "obvious" that *Sevier* "cannot clearly establish substantive constitutional law" because the general statement relied on was merely dicta in "a decision where the court did not even have jurisdiction." *Id.* As for *Allen*, the "officers in *Allen* responded to a potential suicide call by sprinting toward a parked car, screaming at the suspect, and attempting to physically wrest a gun from his hands." *Id.* According to the Court, the "facts of *Allen* are dramatically different from the facts [of *Bond II*]." *Id.* I must reach the same conclusion in this case.

*Allen*'s holding that officers act recklessly by sprinting at a suicidal person, screaming at him, and attempting to physically wrest a gun from his hands does not clearly establish that officers act recklessly by directly confronting an irrational person suspected of assault with a sword. The district court correctly concluded *Sevier* and *Allen* did not place the officers on notice that their conduct violated the Constitution, and its judgment must be affirmed.

## III. Ms. Lennen waived appellate review of her municipal liability claim.

The majority affirmed the grant of summary judgment to the City of Casper based on the lack of an underlying constitutional violation. I would affirm the district court's alternative ground—that Ms. Lennen failed to demonstrate the City's deliberate indifference because she had "not pointed to '[a] pattern of similar constitutional violations by untrained employees' that would have put the City on

8

reasonable notice of its alleged failure to train." Aplt. App. at 297 (alteration in original) (quoting *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1285 (10th Cir. 2019)). Nor had Ms. Lennen "shown, or even argued, that this case would fall within the 'narrow range of circumstances' in which the unconstitutional consequences of the alleged failure to train are 'patently obvious' without a pattern of violations." *Id.* (quoting *Waller*, 932 F.3d at 1285). Ms. Lennen never addressed this conclusion on appeal and thus has waived review of the issue. *See Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 877 (10th Cir. 2004) ("[Appellant] only appeals the grant of summary judgment on the first ground. Thus, she waived her right to appeal the alternate ground upon which the district court based its summary judgment . . . ."). The district court's judgment for the City must be affirmed.

9